Filed 9/11/14  P. v. Jenkins CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY BERNARD JENKINS et al.,<br><br>    Defendants and Appellants. | A136340<br><br>(Sonoma County<br>Super. Ct. No. SCR606397) |

Defendants Jeffrey Bernard Jenkins and Johnny Lamar Payton stole a purse containing $10,000 from the office manager of a furniture store and later burned the purse.  After a joint trial, a jury convicted them both of one felony count of second degree robbery and one felony count of arson.[1]

The trial court found no sentencing enhancements for Jenkins, and it sentenced him to three years and eight months in state prison, comprising a term of three years for the robbery and a consecutive term of eight months for the arson.  The court found significant sentencing enhancements for Payton.  It found true allegations that he had three prior felony convictions that were serious and constituted strikes and three prior

---

[1] The robbery convictions were under Penal Code section 211, and the arson convictions were under Penal Code section 451, subdivision (d).  All further statutory references are to the Penal Code.

1

felony convictions that included a prison term.[2]  The court sentenced Payton to 61 years to life in state prison, comprising a term of 25 years to life for the robbery, a consecutive term of 25 years to life for the arson, two consecutive terms of five years based on prior adult convictions for serious felonies, and a consecutive term of one year based on one of the prior felony convictions with a prison term.[3]

On appeal, both defendants contend that they are entitled to a new trial because the trial court improperly commented on the evidence and that they must be resentenced because the court failed to recognize it had discretion to impose concurrent terms for the arson.  Payton separately contends that his robbery conviction must be reversed because of instructional errors related to an uncharged conspiracy and that he must be resentenced for three additional reasons:  the use of a prior juvenile conviction as a strike violated his right to a jury trial; his motion to strike his prior convictions for sentencing purposes under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero* motion) was improperly denied; and his sentence constitutes cruel and unusual punishment.

We conclude that Jenkins must be resentenced because the trial court did not realize it had discretion to impose a concurrent sentence for his arson conviction, and we

---

[2] Payton had previous felony convictions for forcible oral copulation in concert under section 288a, subdivision (d), a juvenile conviction; assault with a firearm under section 245, subdivision (a)(2); and making terrorist threats under section 422.  The trial court found these convictions to be strikes under section 1170.12.  It also found them to be serious under section 667, subdivision (a)(1), but it later struck the finding that the prior juvenile conviction was serious because juvenile convictions cannot be used as enhancements under that statute.  (*People v. Smith* (2003) 110 Cal.App.4th 1072, 1080, fn. 10.)  In addition, based on Payton's imprisonment for the latter two felony convictions and for a conviction for failing to register as a sex offender under former section 290, subdivision (a)(1), the court found that Payton had three prior convictions with a prison term under section 667.5, subdivision (b).

[3] The abstract of judgment reflects that the one-year enhancement was imposed under section 667, subdivision (a)(1), but the trial court orally imposed it under section 667.5, subdivision (b), the correct statute.  We order the abstract of judgment corrected to reflect the court's oral pronouncement.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186 [on own motion, appellate court may order correction of abstract of judgment to reflect trial court's oral judgment].)

order the clerical error in Payton's abstract of judgment to be corrected, but we otherwise affirm.

## I.
### FACTS

L.O., the office manager of a furniture store in Rohnert Park, was responsible for depositing each day's receipts at the bank on the next day the bank was open. She customarily arrived at the store before it opened, counted and balanced the receipts, and left for the bank mid-morning. The other employees were generally aware of this practice. On September 6, 2011, the Tuesday after Labor Day, she counted the cash and checks that had been received over the holiday weekend. Around 9:30 a.m., before the store opened, she received a call from Payton, who wanted to know if he would be issued a paycheck that week. Payton had worked at the store as a salesperson for about five months before quitting in mid-2011. Salespeople were paid on commission after furniture items were delivered, and Payton had continued to receive paychecks after his employment ended. L.O. told Payton that a paycheck would be ready for him that week.

A few minutes later, Payton walked into the furniture store, still on the phone with L.O. He hung up and talked for a few minutes with the store manager, E.P. Payton then walked toward the back of the store and into L.O.'s office. Although Payton routinely came to the store to pick up his checks, he had never previously entered L.O.'s office to ask about or get a check. L.O. was still counting the receipts, and there was cash on her desk. She was on the phone, and she waved to Payton but they did not speak to each other.

On his way out of the store, Payton had another brief conversation with E.P. A maintenance worker, who was on his break, saw Payton and E.P. speaking to each other outside the store and also noticed a silver Saturn SUV parked nearby. A person wearing a hat was sitting in the SUV's passenger seat. About half an hour later, the worker went outside again and saw a tall, African-American man standing outside the store's doors and texting on a cell phone but did not see Payton.

3

L.O. finished counting the receipts, which totaled about $10,000 in cash and $24,000 in checks. She put the money in her purse, told E.P. that she was going to the bank, and left the store a little after 10:30 a.m. As L.O. was walking to her car, she heard a man behind her "either ask[] for a dollar or a lighter." She kept walking, and the man said, "Give me the money." She turned to see the man, who was wearing a red hat and whom she later identified as Jenkins, standing next to her. After she responded, "What money?" Jenkins said, "Give it to me if you don't want to get hurt," and he grabbed her purse from her shoulder and ran.

B.S., who worked at a nearby mattress store, was looking out the window when he saw a man running through the parking lot. The man, whom B.S. described as "a skinny, medium-height black guy" wearing a hat, momentarily "crouched down behind" B.S.'s car and looked behind him. The man then got into the passenger side of a small, silver SUV, which drove away.

The evidence showed that Payton, after leaving the furniture store's parking lot, drove directly to the mattress store's parking lot and remained there for about 20 minutes. He was wearing a GPS bracelet that day, and the parties stipulated to his whereabouts at various times to avoid the need for a parole agent's testimony.

The men then drove to a market in Santa Rosa, where Jenkins was recorded on camera purchasing lighter fluid. Payton then stopped a block away from a Santa Rosa hotel and stayed there for five minutes. Burnt straps from L.O.'s purse and several of L.O.'s personal items, some also burnt, were later found near the hotel. It appeared L.O.'s purse had been soaked in an accelerant and set on fire.

Payton was arrested later that day. He was one of the registered owners of a silver Saturn Vue SUV.

Two days later, a Santa Rosa police officer stopped a car Jenkins was driving and found $2,100 in cash in Jenkins's pocket. Less than two hours later, a Cloverdale police officer stopped a different car Jenkins was driving and found approximately $2,000 in a compartment under the stereo. Jenkins was arrested the next day, and L.O. identified him in a photographic line-up as the man who stole her purse.

4

Jenkins's cell phone records showed an exchange of text messages between Payton and Jenkins on September 6. At around 9:00 a.m., Payton, who showed up as "Kuzzin Johnny" on Jenkins's phone, texted Jenkins, "Free. What's up, Brah? Hit me. It's a go." At 10:29 a.m., Jenkins texted Payton, "Damn, Kuzzin, where this bitch at?" Two minutes later, Payton responded, "She must still be in the office," and asked, "Is you still at the same spot?" Jenkins immediately replied, "Yep, yep." Some time later, Jenkins sent a text directing Payton to "delete [him c]ompletely" from Payton's phone, including the text messages, and Payton did so. Jenkins's phone also contained two photographs, both time-stamped less than an hour after L.O.'s purse was stolen, showing a man holding "a wad of cash."

## II.
### DISCUSSION

*A. The Trial Court's Comments on the Evidence Did Not Justify a Mistrial.*

Both defendants argue that they are entitled to a new trial because the trial court improperly commented on the evidence before the jury. We are not persuaded.

During direct examination, Detective Patrick Fahy of the Rohnert Park Police Department referred to L.O. as "the victim of the robbery." On cross-examination, Jenkins's trial counsel asked Detective Fahy whether he had meant to refer to "the victim of an alleged robbery." After the prosecutor objected on relevance grounds and the trial court sustained the objection, the following discussion took place:

> [JENKINS'S COUNSEL]: I just wanted to clarify that when he refers to the robbery victim, he's referring to the alleged robbery; that's all I'm seeking to elicit from the witness.

> THE COURT: The [victim] . . . testified in open court that she was robbed. The issue is: Who did it?

> [JENKINS'S COUNSEL]: Well, actually, there's also an issue of whether there was a robbery. . . .

> [PROSECUTOR]: I'm going to object to this speaking objection. Maybe we could have a sidebar or something. I think we're arguing in front of the jury.

5

THE COURT: Overruled. [¶] Go ahead and answer . . . . [¶] Or what was your question, again?

[JENKINS'S COUNSEL]: I just wanted to make sure that the detective was testifying that [L.O.] was a victim of an alleged robbery.

[PROSECUTOR]: And, again, that[] calls for a conclusion.

[JENKINS'S COUNSEL]: Your Honor, it's for the jury to decide.

THE COURT: Overruled. [¶] Go ahead. [¶] It is for the jury to decide.

[DETECTIVE FAHY]: Yes.

Defendants moved for a mistrial. Jenkins's trial counsel argued that "the key issue" was not whether Jenkins was involved in stealing L.O.'s purse but whether the elements of robbery had been proven. The trial court denied the motion, determining that it would suffice to give the jury a "cautionary instruction." After a break, defendants renewed their motion, and the court denied it again.

When the jury returned, the trial court gave it a modified version of CALCRIM No. 3530 as follows: "Do not take anything I said or did during the trial as an indication of what I think about the evidence, the witnesses, or what your verdicts should be. It is not my role to tell you what your verdicts should be. You are the sole judges of the evidence and believability of the witnesses. It is up to you and you alone to decide the issues in this case. You . . . must disregard any of my comments about the case." The court further stated, "And I want to remind you that the two . . . charges here are robbery, which is the taking of personal property of another; and . . . setting fire to the personal property of another. It is your job to decide whether those crimes occurred and, if so, whether either of these defendants [is] responsible for it." After the close of evidence, the court again instructed the jury under CALCRIM No. 3530.

A trial court "may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10.) Such a comment " 'must be accurate, temperate,

6

nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power. [Citations.]' " (*People v. Proctor* (1992) 4 Cal.4th 499, 542.) Under this standard, the court "has 'broad latitude in fair commentary, so long as it does not effectively control the verdict.' " (*Ibid.*)

"To require the grant of a mistrial motion, the risk of prejudice [from an event] must be incurable by admonition or instruction." (*People v. Elliott* (2012) 53 Cal.4th 535, 575.) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter' " (*People v. Alexander* (2010) 49 Cal.4th 846, 915), and we therefore review a trial court's denial of a mistrial motion for an abuse of discretion. (*Elliott*, at p. 575.)

The Attorney General concedes that the trial court's comments were improper but argues that the court's curative instructions sufficiently alleviated any prejudice. Defendants contend that the prejudicial effect of the court's statements was incurable because they effectively relieved the prosecution of proving robbery beyond a reasonable doubt. We disagree with defendants' characterization of the court's comments. The victim testified multiple times that she was "robbed," and the court's observation that she had "testified in open court that she was robbed" was accurate. Although the court's follow-up statement was misleading because it implied that the only issue was identity, the statement cannot be reasonably interpreted to constitute a pronouncement that the other elements of robbery had been proven. And the court's instruction effectively cleared up any misunderstanding by informing the jury that its role was to determine the verdicts and decide whether the defendants were guilty of robbery. Juries are presumed to follow the instructions given, and defendants offer no reason for us to conclude that

7

this presumption was overcome in this case.[4] (*People v. Jackson* (2014) 58 Cal.4th 724, 767; see *People v. Monterroso* (2004) 34 Cal.4th 743, 784.)

The cases defendants cite do not change our conclusion. Jenkins primarily relies on *People v. Sturm* (2006) 37 Cal.4th 1218, in which our state Supreme Court reversed a death sentence because of "[t]he cumulative effect of the trial judge's comments" throughout the penalty phase of the trial. (*Id.* at p. 1244.) One such comment was the trial court's statement to prospective penalty-phase jurors that premeditation was "a gimme," even though the defendant had actually been convicted of felony murder and "a lack of premeditation was a central theory supporting the defense case in mitigation." (*Id.* at pp. 1230-1232, italics omitted.) That comment is not analogous to the one the trial court made here. But even if we thought otherwise, *Sturm* is still readily distinguishable because the trial court in that case refused to give a curative instruction (*id.* at p. 1232), and it made many other improper comments throughout the penalty phase, including statements that disparaged defense counsel and defense witnesses and implied an alliance between the court and the prosecution, that "created an atmosphere of unfairness." (*Id.* at pp. 1238, 1243.) The Supreme Court's conclusion that the errors were prejudicial was based on their cumulative effect, and it noted that "no one instance of misconduct appear[ed] to, in itself, require reversal." (*Id.* at p. 1243.) Here, in contrast, the trial court's challenged comments were brief and limited to one occasion, and the trial court immediately gave curative instructions.

Payton relies on two federal cases in which a trial court expressed the opinion that the prosecution had established one or more elements of the crime beyond a reasonable doubt, even though the elements were disputed. In *United States v. Murdock* (1933) 290 U.S. 389, the trial court told the jury, " 'I want to instruct you that whatever the court

---

[4] Jenkins also argues that the trial court's characterization of robbery as "the taking of personal property of another" after giving the curative instruction the first time "only exacerbated the error because . . . it omitted the force or fear element." But the jury was later properly instructed on the elements of robbery, including the use of force or fear, and again there is no indication that it failed to follow the instruction.

may say as to the facts, is only the court's view. You are at liberty to entirely disregard it. The court feels from the evidence in this case that the Government has sustained the burden cast upon it by the law and has proved that this defendant is guilty in manner and form as charged beyond a reasonable doubt.' " (*Id.* at p. 393.) The United States Supreme Court concluded that an element of the crime was fairly in dispute and affirmed the reversal of the judgment by the Seventh Circuit Court of Appeals. (*Id.* at pp. 391, 394, 397-398.)

In *United States v. Brandom* (8th Cir. 1973) 479 F.2d 830, the Court of Appeals considered a trial court's statement that "evidence show[ed] beyond a reasonable doubt" that two elements of the crime at issue had been established. (*Id.* at pp. 831-833, italics omitted.) *Brandom* concluded that, even though the trial court had not expressly referred to the defendant's "guilt" as the trial court had in *United States v. Murdock*, *supra*, 290 U.S. 389, its "comments were equivalent to a partial directed verdict and expression of guilt." (*Brandom,* at p. 833.) Although the trial court had instructed the jury that it was "the sole judge of the facts, and that [it] must determine whether there was an intent to defraud beyond a reasonable doubt," the Court of Appeals determined that "the alleged curative instruction" was insufficient, especially because "in giving [it], the trial judge emphasized his authority by pointing out his long legal experience and indicating that he was more likely than the jury to understand the . . . matters on which he commented." (*Id.* at pp. 836-837.)

The comments here are not nearly as prejudicial as those made in *United States v. Murdock*, *supra*, 290 U.S. 389 or *United States v. Brandom*, *supra*, 479 F.2d 830. The trial court here did not say that either defendant was "guilty" or that any element of robbery had been proven "beyond a reasonable doubt." And, as we have already mentioned, the court's statement that the victim had testified she was robbed was entirely accurate. Thus, its comment that identity was at issue was far from the equivalent to a directed verdict on the other elements of robbery. We conclude that the court did not abuse its discretion by determining that any risk of prejudice created by its comments was curable and that it properly denied the motion for a mistrial.

9

## B. *There Are No Instructional Errors Involving an Uncharged Conspiracy that Warrant Reversal of Payton's Robbery Conviction.*

Defendants were not charged with having engaged in an illegal conspiracy. But the trial court instructed the jury that they could be liable for the offenses charged by having participated in a conspiracy. Payton claims that the instructions given, as well as the court's failure to instruct the jury that it was required to find whether there was one overall conspiracy or separate ones to commit robbery and arson, improperly allowed him to be convicted of robbery based on overt acts that occurred after the robbery was completed and conspiracy to commit arson instead of robbery.[5] We reject these claims.

The jury was instructed under a modified version of CALCRIM No. 416 that "[a] member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy . . . done to help accomplish the goal of the conspiracy" and that a defendant's membership in a conspiracy required proof that (1) "the defendant intended to agree and did agree with the other defendant to complete a target crime"; (2) "at the time of the agreement, the defendant and the other alleged member of the conspiracy intended that one or more of them[] would commit a target crime"; (3) "one of the defendants or both of them committed at least one of [a list of five] overt acts to accomplish the target crime"; and (4) "at least one of these overt acts was committed in California." The listed overt acts were that (1) "Payton drove . . . Jenkins to the scene of the crime"; (2) "Payton and Jenkins texted back and forth regarding the implementation and commission of a target crime"; (3) Payton and Jenkins "met up together after the commission of the target crime and drove off"; (4) "[a] defendant bought lighter fluid"; and (5) "[a] defendant burned evidence of the target crime." The instruction further provided that "[a]n overt act is an act [done] by one or more of the members of the conspiracy that is done to help accomplish the agreed[-]upon crime" and that any such act

---

[5] On appeal, Jenkins purports to join in Payton's conspiracy-related claims. We conclude that these claims, which seek the reversal of Payton's robbery conviction only, are not relevant to Jenkins, who may have been found guilty of arson as a coconspirator but was clearly the robbery's direct perpetrator.

had to "happen after the defendant has agreed to commit the crime," but that the jury did not have to agree on a specific overt act or on who committed it. The jury was also instructed on aiding and abetting liability.

Earlier drafts of the conspiracy instruction referred to "Penal Code Section 211" or "robbery" instead of "target crime." Payton's trial counsel took issue with the references to robbery because of the possibility that only a grand theft was committed, and the prosecutor noted that her theory was also that the defendants had conspired to commit arson. The parties agreed to revise the instruction to refer to "target crime" instead.

Payton's counsel also raised the issue of "when . . . the target crime has concluded," arguing that a conspiracy to commit grand theft would end when the property was taken, while the prosecutor argued that a conspiracy to commit robbery would continue "until [defendants] reach[ed] a point of safety" and "disposed of the evidence of the crime." The trial court stated, "[T]hat will be up [to] the jury to decide."

We review claims of instructional error de novo " 'to determine if there was a reasonable likelihood that the jury applied the challenged instruction in an impermissible manner.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1217; *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

       1.    Any error in the trial court's failure to instruct on the required timing of the overt acts was harmless.

Payton first argues that the trial court erred by not instructing the jury that it was required to find that he committed an overt act before the robbery was completed to find him guilty of robbery on a conspiracy theory. He claims that the version of CALCRIM No. 416 given permitted him to be found guilty of robbery based on an improper overt act because two of the acts listed, the purchase of lighter fluid and the burning of "evidence of the target crime," occurred after the robbery was complete. We conclude that any error was harmless.

11

The Attorney General first argues that Payton waived this claim under the doctrine of invited error. We disagree. " ' "The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction." ' " (*People v. Thornton* (2007) 41 Cal.4th 391, 436.) Here, while Payton agreed to certain changes to CALCRIM No. 416, none of those changes created the issue he now raises. In fact, he raised the issue of when the crime was completed for purposes of the conspiracy's termination, and the trial court responded by refusing to modify the instruction. But even though Payton failed to object to the instruction on the specific basis that it included no requirement that an overt act had to occur before the target crime was completed, we consider his claim because he alleges the instruction's deficiency affected his "substantial rights." (§ 1469.)

We note that we must address the merits of Payton's claim despite the possibility that the jury found Payton guilty on (1) an aiding-and-abetting theory of liability or (2) a conspiracy theory based on one of the three other overt acts that Payton agrees occurred before the robbery was completed. This is because the jury was not required to unanimously agree on the theory by which it found him guilty of the substantive crime. (See *People v. Valdez* (2012) 55 Cal.4th 82, 153.) Nor was it required to unanimously agree on a particular overt act even to the extent the jurors accepted the conspiracy theory of liability. (*People v. Prieto* (2003) 30 Cal.4th 226, 251.) Since the verdict does not reveal the theory or theories under which Payton was convicted, we consider his claim that the instruction was legally incorrect even though the claim bears only on the theory of conspiracy and, even then, only on certain overt acts. (See *People v. Morales* (2001) 25 Cal.4th 34, 43 [" ' "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand" ' "].)

In arguing the merits of his claim, Payton primarily relies on *People v. Brown* (1991) 226 Cal.App.3d 1361, which reversed a conviction for conspiracy to commit

robbery where "the sole overt act found by the jury occurred after completion of the conspiracy's objective, robbery." (*Id.* at p. 1363.) In that case, in which the verdict form required findings as to each overt act, the jury found that the defendant had "shared in the proceeds of the robbery" but did not find true the other two overt acts alleged. (*Id.* at p. 1367 & fn. 2.) The Court of Appeal concluded that "[s]haring in the proceeds of the robbery [was] not an act looking toward the accomplishment of the crime of robbery" and that the defendant's participation in a conspiracy therefore could not be based on that act. (*Id.* at pp. 1368-1369.)

We need not determine whether *People v. Brown*, *supra*, 226 Cal.App.3d 1361 applies or, if so, when the robbery here was "completed" in *Brown*'s sense of the term, because any error in the trial court's failure to instruct the jury on the timing of the overt acts was harmless. To find such an error harmless, "a reviewing court must conclude, beyond a reasonable doubt, that the jury based its verdict on a legally valid theory." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201-1203.) A court may do so not only where " 'the jury verdict on other points effectively embraces' " the one at issue but also where " 'it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well.' " (*Id.* at p. 1204, italics in original.) Here, it would have been impossible for the jury to have found both defendants guilty of arson, as it did, without finding true the third overt act listed: that "[d]efendants met up together after the commission of the [robbery] and drove off." Since the jury must have found that defendants drove off together after the robbery, it necessarily found an overt act sufficient to support the robbery conviction based on a conspiracy theory. Accordingly, we conclude that any error related to the timing of the overt acts was harmless beyond a reasonable doubt.

> 2. Payton forfeited his claim that instructional error permitted him to be convicted of robbery based on a conspiracy to commit arson.

Payton also argues that the references to "a target crime" in the modified version of CALCRIM No. 416 were "ambiguous" and permitted the jury to convict him of robbery on the theory that he conspired to commit *arson*. We reject this claim.

13

The Attorney General contends that Payton has also waived this argument under the doctrine of invited error. In this case, we agree. Payton requested that the instruction be changed to refer to "target crime" based on the defense that Jenkins committed grand theft, not robbery. Even though the prosecutor commented that this revision was also desirable because of her position that one theory by which the defendants were liable for arson was that they conspired to commit it, Payton did not raise any concern that using the term "target crime" might permit the jury to find him guilty of robbery based on a conspiracy to commit arson. We conclude that he waived this claim because he " ' "made a 'conscious and deliberate tactical choice' to 'request' the instruction," ' " and, moreover, was on notice that "target crime" could also refer to arson. (*People v. Thornton*, *supra*, 41 Cal.4th at p. 436.)

Even if we were to reach the merits of Payton's claim, we would reject it. The instruction directed the jury that it could find a defendant liable for "the acts or statements of any other member of the conspiracy . . . done to help accomplish the goal of the conspiracy." We do not see how the jury could have concluded that Jenkins's commission of the *robbery* was an act "done to help accomplish the goal of" a conspiracy to commit *arson*. Of course, it is possible for a crime to be committed in furtherance of a conspiracy to commit another crime. Here, however, there was no evidence to suggest that any conspiracy to commit arson arose before Jenkins stole the purse, much less that he stole the purse in order to carry out a plan to burn it. Under the circumstances, the instruction did not permit Payton to be convicted of robbery based on a conspiracy to commit arson.

3. Payton's claim that the jury had to be instructed on the possible existence of multiple conspiracies fails.

Finally, Payton argues that his conviction for robbery must be reversed because the trial court did not sua sponte instruct the jury that it was required to determine whether there was one overall conspiracy or two separate conspiracies (one for robbery and one for arson). He argues that this failure allowed him to be convicted of robbery

14

based on overt acts occurring after the robbery's commission and based on a conspiracy to commit arson. We disagree.

There is a split in authority whether a trial court has a sua sponte duty to instruct the jury to determine how many conspiracies, if any, were committed when a defendant is charged with multiple counts of conspiracy. (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1668 [discussing cases].) In such a case, it is to the defendant's benefit that the jury be given the option of finding only one conspiracy instead of convicting the defendant of multiple conspiracies. The rationale for allowing a jury to find only one conspiracy is that "the essence of the crime of conspiracy is the agreement, and thus it is the number of agreements (not the number of the victims or number of statutes violated) that determine[s] the number of the conspiracies." (*Id.* at p. 1669.) That rationale is inapplicable here because Payton was not charged with conspiracy, and conspiracy was merely one theory by which he could be found liable for the crimes charged. It does not support an extension of a sua sponte duty to instruct on the number of conspiracies to this context.

Even assuming that such a duty existed under the circumstances presented here, any error in the trial court's failure to instruct on the number of conspiracies was harmless. The modified version of CALCRIM No. 416 repeatedly referred to conspiracy to commit "a target crime" or "the target crime," and we perceive no suggestion to the jury that it could conclude there was a single conspiracy to commit both crimes. In fact, the prosecutor argued in closing that there were two separate conspiracies: "Conspiracy applies not only to the robbery but to the arson. So there's two parts to this, and the first part is the conspiracy to commit robbery." There is nothing in the record to suggest that the jury might have concluded there was only one conspiracy, and we therefore conclude that any purported constitutional error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24) and that it was not reasonably probable that Payton would have received a more favorable verdict if the jury had been explicitly instructed on the possibility that there was more than one conspiracy. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

*C. Remand Is Required for the Trial Court to Determine Whether Jenkins's Sentence for Arson Should Be Concurrent or Consecutive.*

Jenkins argues that we must remand for resentencing because the trial court erroneously concluded that it had no discretion to impose a concurrent, rather than consecutive, term for the arson conviction. The Attorney General concedes that remand is required, and we accept the concession.

In sentencing Jenkins, the trial court stated that it was imposing a consecutive sentence for the arson because section 667, subdivision (c)(6) "requires consecutive sentencing." Under that statute, "Notwithstanding any other law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more prior serious and/or violent felony convictions," a trial court must impose a consecutive sentence "[i]f there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts." (§ 667, subd. (c)(6).) No prior convictions were alleged or proven against Jenkins, however, and section 667, subdivision (c)(6) was therefore inapplicable. Instead, the court had discretion to determine whether to impose a concurrent or consecutive sentence. (§ 669, subd. (a); see also Cal. Rules of Court, rule 4.433(c)(3).) Remand for resentencing is appropriate because the court was unaware of its discretion, and there is no indication that, had it been aware of its discretion, it would nevertheless have imposed a consecutive sentence. (*People v. Deloza* (1998) 18 Cal.4th 585, 600; *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.)

*D. The Trial Court Properly Concluded that Payton's Arson Term Had to Be Consecutive.*

Payton argues that the trial court erred by determining that the robbery and arson occurred on separate occasions and that it therefore lacked discretion to impose a concurrent term for his arson conviction. We disagree.

The trial court determined that "concurrent sentencing is not an option here because the robbery was fully completed before [Payton] and . . . Jenkins drove to the convenience store in Santa Rosa from Rohnert Park, and . . . from the site of the

16

convenience store [Payton or both defendants] drove to Olive Park, also in Santa Rosa, where the purse was lit on fire and burned," and the crimes were therefore "separate[] . . . in place and time and gave . . . Payton . . . an opportunity to reflect on [his] actions." The court further determined that the crimes "did not arise out of the same set of operative facts."

As stated above, when "a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more serious and/or violent prior felony convictions," the trial court must impose a consecutive sentence "[i]f there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts." (§ 667, subd. (c)(6).) In other words, consecutive sentencing is mandatory if the current felony convictions were not committed on the same occasion or did not arise from the same set of operative facts. (*People v. Deloza*, *supra*, 18 Cal.4th at pp. 590-591.) If, however, " 'the multiple current felony convictions are "committed on the same occasion" *or* "aris[e] from the same set of operative facts," ' " the court has discretion to impose a concurrent sentence. (*Id.* at p. 591, italics added; *People v. Lawrence* (2000) 24 Cal.4th 219, 233.)

We review the trial court's determination of whether the current crimes were committed on the same occasion or arose from the same set of operative facts for substantial evidence. (See *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1566-1567.)

" 'The phrase "committed on the same occasion" . . . refer[s] to at least a close temporal and spatial proximity between two events, although it may involve other factors as well.' " (*People v. Lawrence*, *supra*, 24 Cal.4th at p. 226, italics omitted.) In *Lawrence*, our state Supreme Court considered whether a defendant's theft of a bottle of brandy from a market, which was accompanied by his battery of a man walking past the market, was " 'committed on the same occasion' " as the defendant's assault on a homeowner whose backyard he ran through during the escape and a later assault with the bottle on the other homeowner when she tried to help her husband. (*Id.* at pp. 223-225.) The court noted that the first assault, in the backyard, occurred "a one- to three-block distance from" the market and "within two or three minutes of" the theft. (*Id.* at p. 228.)

It concluded that the crimes were committed on separate occasions because they (1) involved "two separate locations (a market and a residence one to three blocks away)"; (2) involved "two entirely separate groups of victims (the [market's] employees and [the battery victim], and [the two assault victims], who had no connection to the first crime)"; (3) "were [not] committed simultaneously"; and (4) were not "through the same criminal act directed against multiple victims." (*Ibid.*) Here, the crimes occurred in different cities and over ten minutes apart, not simultaneously. Thus, "a close temporal and spatial proximity between" the crimes is even more absent here than it was in *Lawrence*. (*Id.* at p. 226, italics omitted.)

Although it is not clear whether Payton actually challenges the trial court's "separate occasions" finding, he does claim that this "case is not controlled by" *People v. Lawrence*, *supra*, 24 Cal.4th 219 because the crimes at issue there involved separate victims. This distinction does not undermine the court's conclusion that the crimes here happened on different occasions. Although the identity of victims may be a relevant factor to the analysis, "a close temporal and spatial proximity between two events" is a *minimal* requirement before they can be found to have been committed on the same occasion. (*Lawrence*, at p. 226.) That requirement is not met here, and the court properly found that the robbery and arson were committed on separate occasions.

We next turn to whether the trial court erred by determining that the robbery and arson did not arise from the same set of operative facts. This requirement is satisfied if the crimes "shar[e] common acts or criminal conduct that serve[] to establish the element of the current felony offenses of which [the] defendant stands convicted." (*People v. Lawrence*, *supra*, 24 Cal.4th at p. 233.) In evaluating this issue, a trial court must consider "the extent to which common acts and elements of such offenses unfold together or overlap, and the extent to which the elements of one offense have been satisfied, rendering that offense completed in the eyes of the law before the commission of further criminal acts constituting additional and separately chargeable crimes . . . ." (*Ibid.*) Whether a defendant is in flight from an earlier offense when later offenses are committed is not dispositive. (See *ibid.*)

18

Payton argues that the robbery and the arson arose from the same set of operative facts because the same person was the victim of each crime and "the same purse was the subject of both the robbery and arson." He attempts to analogize this case to *People v. Garcia*, *supra*, 167 Cal.App.4th 1550, in which the Court of Appeal affirmed the finding that an offense of firearm possession arose from the same set of operative facts as "robberies, carjacking, and vehicle-theft-related crimes" that all involved use of the same firearm. (*Id.* at p. 1567.) As a result, "every other count share[d] common acts or criminal conduct—possession of . . . the same firearm by the same previously arrested felon." (*Ibid.*) Here, however, the fact that the two crimes were directed at the same victim and the same property does not establish any meaningful overlap between the *conduct* involved. There was substantial evidence that the robbery was completed well before the arson began because the defendants reached "a place of temporary safety" before the arson was committed. (*People v. Debose* (2014) 59 Cal.4th 177, 205; see *People v. Lawrence*, *supra*, 24 Cal.4th at pp. 232-233.) There was also substantial evidence that the acts constituting the robbery—the taking of the purse by force or fear— and Payton's acts rendering him liable for that robbery were not the same acts as those comprising the arson—the burning of the purse. (See §§ 211, 451.) We conclude that there was substantial evidence to support the trial court's determination that a consecutive term for the arson was mandatory.

### E. Payton's Claim that the Use of His Juvenile Conviction to Enhance His Sentence Was Unconstitutional is Foreclosed.

Payton claims that the use of his juvenile conviction as a strike violated his constitutional rights because he did not have the right to a jury trial in the juvenile proceeding. When presented with the same argument in *People v. Nguyen* (2009) 46 Cal.4th 1007, our state Supreme Court held "that the absence of a constitutional or statutory right to jury trial under the juvenile law does not, under *Apprendi* [*v. New Jersey* (2000) 530 U.S. 466], preclude the use of a prior juvenile adjudication of criminal misconduct to enhance the maximum sentence for a subsequent adult felony offense by the same person." (*Nguyen*, at pp. 1011, 1028.) Payton recognizes that we are bound by

19

*Nguyen*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Accordingly, we reject this claim.

### F. *The Trial Court Did Not Abuse Its Discretion by Denying Payton's* Romero *Motion.*

Payton claims that the trial court abused its discretion by denying his *Romero* motion to strike his prior convictions for purposes of sentencing. We disagree.

In his *Romero* motion, Payton argued that his prior convictions should be stricken because he had a difficult childhood, his "alcohol problem" played a role in some of his crimes, the robbery and arson were not violent offenses, and he had been doing well on parole until committing those crimes. At the sentencing hearing, the trial court determined that Payton did not "fall[] outside the three-strike sentencing scheme":

> [Payton] is a habitual offender. He's been in and out of prison since 1995. He has committed violent offenses, including a brutal rape pointing . . . a loaded gun at a victim. And . . . the second-strike offense [is for assault with a firearm], which occurred shortly after his release from the rape conviction, and the third prior strike is making threats to kill the victim in front of his [two]-year-old child. This offense occurred within . . . 13 days after his release on the [assault with a firearm].
>
> After the release on parole in this most recent offense, there have been five or six returns to custody for violations of parole, several of which also resulted in arrests for new crimes. In light of the violent nature of the crimes . . . that have constituted the strike offenses, there is no basis for the [c]ourt to find that it would be in the interest of justice to strike one, let alone more than one of these prior-strike convictions.
>
> And, Mr. Payton, I'm very sorry that you had such a difficult start in life. It's very unfortunate. But at some point, you just have to take responsibility for your actions. And you've been given multiple chances to reform through being given very short stints in prison, even though these offenses are quite serious, and none of them have seem[ed] to make a difference in changing your behavior to a law-abiding lifestyle.

A trial court may, "in furtherance of justice" (§ 1385, subd. (a)), dismiss a finding that a defendant has previously been convicted of a serious and/or violent felony, or strike. (*People v. Carmony* (2004) 33 Cal.4th 367, 373; *People v. Superior Court (Romero)*, *supra*, 13 Cal.4th at pp. 529-530.) We review the denial of a *Romero* motion

for an abuse of discretion. (*Carmony*, at p. 374.) The three strikes law, which is " 'intended to restrict courts' discretion in sentencing repeat offenders' . . . [¶] . . . [¶] . . . creates a strong presumption that any sentence that conforms to [its] sentencing norms is both rational and proper." (*Id.* at pp. 377-378.) As a result, "a trial court will only abuse its discretion in failing to strike a prior felony conviction . . . in limited circumstances," such as where it did not realize it had discretion to do so, where it "considered impermissible factors in declining to dismiss" the conviction, or where " 'the sentencing norms [of the three strikes law] . . . produce[] an "arbitrary, capricious[,] or patently absurd" result' under the specific facts of a particular case." (*Id.* at p. 378.)

Payton does not argue that the trial court misunderstood its discretion or that it considered improper factors in denying the *Romero* motion. Nor does he dispute the facts underlying his previous convictions as described by the court. Instead, he claims "that his situation falls outside the three-strikes sentencing scheme," and the court erred by not considering "the remoteness of . . . [his] prior convictions" and "the gross disparity between . . . [the] sentence of Jenkins, the actual perpetrator," and his own sentence. We disagree with both contentions. As the court's careful findings make clear, Payton falls squarely within the "spirit of the [three strikes] scheme." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.) He is a classic reoffender who, despite many opportunities for reform, has continued to commit crime after crime. Nor do we find fault with the court for not discussing the timing of the earlier convictions or Jenkins's sentence. Payton did not raise either factor in his *Romero* motion. More importantly, both factors are of questionable weight given the three strikes law's directive that the remoteness of a prior conviction "shall not affect the imposition of sentence" and its essential purpose of "punish[ing] repeat criminal offenders" more "severely" than defendants, like Jenkins, who have no prior strikes. (§ 667, subd. (c)(3); *People v. Vargas* (2014) 59 Cal.4th 635, 641.) The court did not abuse its discretion by denying the *Romero* motion.

G. *Payton's Sentence Does Not Constitute Cruel and Unusual Punishment.*

Finally, Payton argues that his sentence of 61 years to life violates the United States and California Constitutions' prohibition of cruel and unusual punishment because

it (1) "was grossly disproportionate to his personal culpability" when compared with Jenkins's sentence and (2) "constituted a de facto sentence of life imprisonment without the possibility of parole for an offense involving no violence, no weapon, and no injury to the victim." (Italics omitted.) We disagree.

When faced with a claim of cruel and unusual punishment under either the federal or state Constitution, "[a] reviewing court determines whether a particular penalty given ' "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235.) "We . . . use a three-pronged approach to determine whether a particular sentence is grossly disproportionate." (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296.) "First, we review 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' " (*Ibid.*) This analysis requires consideration of " 'the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts,' " as well as " 'the defendant's age, prior criminality[,] and mental capabilities.' " (*Cole*, at p. 1235.) "Second, we compare the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction. [Citation.] Third, and finally, we compare the challenged punishment to the punishments for the same offense in other jurisdictions. [Citation.] The importance of each of these prongs depends upon the facts of each specific case[, and] . . . we may base our decision on the first prong alone." (*Johnson*, at pp. 296-297.)

Although the parties dispute whether Payton forfeited this claim by failing to raise it below, we need not resolve this issue because we reject the claim on its merits. Payton implies that the current offenses are minor, characterizing them as the aiding and abetting of "a 'purse snatch' and . . . the burning of the stolen purse." But both robbery and arson are "serious felonies" (§ 1192.7, subd. (c)(14), (19)), and robbery is also a " 'violent felony.' " (§ 667.5, subd. (c)(9).) As a result, Proposition 36, under which "a defendant who has two or more . . . strikes . . . is not necessarily subject to an enhanced 'third

22

strike' sentence if the current conviction is not for a serious or violent felony," does not affect his sentence. (*People v. Bradford* (2014) 227 Cal.App.4th 1322, 1327-1328.) Payton complains that he "is truly being punished again for his prior convictions, not for the current offense[s]," but, as we have discussed, his criminal history marks him as " 'precisely the type of offender from whom society seeks protection by the use of recidivist statutes.' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 570 [concluding that defendant's sentence under three strikes law did not constitute cruel and unusual punishment].) Finally, he claims that the sentence is "grossly excessive punishment when compared with the punishment for far more serious crimes" because it exceeds the mandatory minimum sentence for first-degree murder with personal use of a firearm. But " 'proportionality assumes a basis for comparison. When the fundamental nature of the offense and the offender differ, comparison for proportionality is not possible.' " (*Id.* at p. 571.) Payton does not explain how his sentence is grossly disproportionate in comparison to sentences imposed on other habitual offenders.

Payton also argues that his sentence constitutes cruel and unusual punishment because it constitutes a de facto sentence to life in prison without the possibility of parole for a nonhomicide offense. He bases his argument on cases holding that life imprisonment without the possibility of parole, or its functional equivalent, for a juvenile offense violates the ban on cruel and unusual punishment. (*Miller v. Alabama* (2012) 132 S.Ct. 2455, 2460; *Graham v. Florida* (2010) 560 U.S. 48, 82; *People v. Caballero* (2012) 55 Cal.4th 262, 268.) As Payton recognizes, the reasoning of these cases has not been extended to adult offenders, and we decline to extend it here.

## III.
### DISPOSITION

The judgment with respect to Jenkins's sentence is reversed and remanded for the trial court to consider whether the term for arson should be concurrent or consecutive to the term for robbery. The clerk of the superior court is directed to prepare a corrected version of Payton's abstract of judgment to reflect that the one-year enhancement was imposed under section 667.5, subdivision (b), not section 667, subdivision (a)(1) and to

forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment with respect to both defendants is otherwise affirmed.


_____
Humes, P.J.


We concur:


_____
Margulies, J.


_____
Dondero, J.